# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ATLANTIC SPECIALTY INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | CIVIL ACTION NO.: 1:19-CV-343 |
| BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA, FEDERAL INSURANCE COMPANY and BCS INSURANCE COMPANY, | ) ) ) ) ) | **JURY DEMAND** |
| Defendants. | ) ) | |

## ATLANTIC SPECIALTY INSURANCE COMPANY'S COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY JUDGMENT

Plaintiff Atlantic Specialty Insurance Company ("Atlantic") brings this complaint for breach of contract and declaratory judgment (the "Complaint") against Defendants Blue Cross and Blue Shield of North Carolina ("BCBS-NC"), Federal Insurance Company ("Federal") and BCS Insurance Company ("BCS"). Atlantic accordingly alleges and seeks relief as follows:

1.     Plaintiff Atlantic is a corporation organized and existing under the laws of New York, with its principal place of business in Plymouth, Minnesota. Atlantic is permitted to issue insurance policies in the State of North Carolina.

2.     Upon information and belief, Defendant BCBS-NC is a corporation organized and existing under the laws of the State of North Carolina with its principal place of business in the State of North Carolina.

3.     Upon information and belief, Defendant Federal is a corporation organized and existing under the laws of the State of Indiana with its principal place of business in the State of Indiana.

4.     Upon information and belief, Defendant BCS is a corporation organized and existing under the laws of the State of Ohio with its principal place of business in the State of Illinois.

<u>**Jurisdiction and Venue**</u>

5.     This is a diversity action for breach of contract, contribution and declaratory relief pursuant to 28 U.S.C. § 2201 to declare the rights and other legal relations of the parties regarding insurance policies.

6.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a).  There is complete diversity of citizenship between Atlantic, on the one hand, and BCBS-NC, Federal and BCS, on the other.  The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

7.     This Court has personal jurisdiction over BCBS-NC, Federal and BCS, and venue is proper in this District under 28 U.S.C. § 1391.

<u>**GENERAL ALLEGATIONS**</u>

8.     Atlantic provided primary Managed Care Errors and Omissions ("E&O") liability insurance to BCBS-NC, Policy No. MCR-5397-12 (the "Atlantic Policy") with limits of $10 million in excess of a $5 million retention, according to its terms, conditions and exclusions.  A copy of the Atlantic Policy is attached as **Exhibit 1**.

9.      Federal provided primary Directors and Officers ("D&O") liability insurance to BCBS-NC, Policy No. 8209-4913 (the "Federal Policy") with limits of $15 million in excess of a $1.5 million retention per antitrust D&O claim, according to its terms, conditions and exclusions.  Excerpts of the Federal Policy can be found in the letters attached as **Exhibits 2-3**.

10.     BCS provided excess E&O liability insurance to BCBS-NC, Policy No. XS MCE 121-310 (the "BCS E&O Policy") with limits of $40 million in excess of the Atlantic Policy's $10 million primary limits, according to its terms, conditions and exclusions.  The BCS E&O Policy follows form to the Atlantic Policy.  A copy of the BCS E&O Policy is attached as **Exhibit 4**.  BCS also provided excess D&O liability insurance to BCBS-NC, Policy No. XSD/O 121-310 (the "BCS D&O Policy") with limits of $35 million in excess of the Federal Policy's $15 million primary limits, according to its terms, conditions and exclusions.  The BCS E&O Policy follows form to the Federal Policy.  A copy of the BCS D&O Policy is attached as **Exhibit 5**.

11.     BCBS-NC has been sued in several class actions across the nation alleging violations of antitrust laws.  These antitrust class actions lawsuits were later consolidated for pretrial proceedings in the Northern District of Alabama (collectively with the component class actions, the "MDL Action").  BCBS-NC sought coverage for the MDL Action from its insurers.

12.     BCBS-NC tendered the component antitrust class actions in the MDL Action to both primary insurers Atlantic and Federal seeking reimbursement of defense expenses and indemnity.

13.     Federal agreed to reimburse 100% of reasonable defense expenses incurred by BCBS-NC in defense of the MDL Action in excess of the $1.5 million retention required by the Federal Policy, subject to a reservation of rights.

14.     Under the Atlantic Policy, Atlantic assumes a duty to defend only upon proper exhaustion of its $5 million retention.

15.     Atlantic and Federal subsequently agreed to share reasonable defense expenses incurred by BCBS-NC in excess of Atlantic's $5 million retention on a pro-rata basis, with Atlantic paying 40% and Federal paying 60% of such costs based on the ratio of their respective limits of liability – i.e., $10 million and $15 million (the "Defense Agreement").

16.     The Atlantic Policy requires its $5 million retention to be paid by BCBS-NC.  Pursuant to the Defense Agreement, Atlantic agreed to allow Federal's payments of reasonable defense expenses under its Policy to erode the $5 million retention under the Atlantic Policy.  Atlantic did so in exchange for consideration obtained in the Defense Agreement and as an accommodation to BCBS-NC.  Specifically, Federal's consideration was its agreement to advance defense costs with Atlantic at a ratio of 60% by Federal and 40% by Atlantic.

17.     Federal has taken the position that its Policy specifically excludes managed care activities.  *See* Federal's April 24, 2013 letter attached as **Exhibit 2** at pg. 4.  Upon information and belief, BCBS-NC has not rejected Federal's contention or otherwise asserted a different understanding.

18.     Both the Federal Policy and the Atlantic Policy require their retentions to be satisfied by payments for loss covered under each policy, respectively.  As it is BCBS-NC's position that the Federal D&O and Atlantic E&O Policies cover independent aspects of the MDL Action, then payments made by Federal under its Policy, or by BCBS-NC to satisfy the retention under the Federal Policy, cannot be applied to satisfy the retention under Atlantic's Policy.  The Atlantic Policy further mandates that BCBS-NC satisfy the $5 million retention by payments out of its own pocket.  Therefore, absent the Defense Agreement, the Atlantic Policy is not triggered unless and until BCBS-NC makes $5 million in payments for covered loss under the Atlantic Policy, separate and apart from paying $1.5 million to exhaust the Federal retention.

19.     Once BCBS-NC and Federal paid in excess of $5 million in reasonable defense expenses, Atlantic began to reimburse under its Policy as promised.  To date, Atlantic has reimbursed Federal $600,000 pursuant to the Defense Agreement and has reimbursed BCBS-NC at least $1,754,311 for defense of the MDL Action.

20.     In October of 2018, however, Federal unilaterally repudiated the Defense Agreement and decided to reduce its contribution to BCBS-NC's defense costs both prospectively and retroactively to account for loss allegedly not covered under its Policy.

Federal also refused to advance additional defense costs until BCBS-NC incurs defense expenses allocable to the Federal Policy in excess of Federal's alleged "overpayment" of $5,879,126. A copy of Federal's letter repudiating the Defense Agreement is attached as **Exhibit 3**.

21. Federal's unilateral repudiation of the agreement relieves Atlantic of its agreement to permit Federal's payments to erode BCBS-NC's retention under the Atlantic Policy.

22. BCBS-NC contends Federal's payments for BCBS-NC's defense expenses, along with BCBS-NC's $1.5 million payments in satisfaction of Federal's retention, both erode the $5 million retention under the Atlantic Policy. Accordingly, BCBS-NC has now turned to Atlantic for payment of 100% of defense costs incurred by BCBS-NC in defending the MDL Action.

23. Upon information and belief, BCBS-NC has done nothing to formally challenge Federal's decision to discount its prior and/or future contributions to defense expenses.

24. Atlantic has been forced to decide between: (1) advancing BCBS-NC's defense expenses under the Atlantic Policy, despite the Atlantic Policy's retention having not having been exhausted, and at the risk that Atlantic may be prejudiced in or precluded from seeking reimbursement of any sums it prematurely reimburses; or (2) refusing to provide BCBS-NC with reimbursement or indemnity until BCBS-NC incurs $5 million in

loss covered under the Atlantic Policy, which could potentially expose Atlantic to bad faith allegations.

25. To protect its insured's interests, Atlantic has agreed, as BCBS-NC's insurer, and not as a volunteer, to reimburse 100% of BCBS-NC's reasonable defense expenses despite BCBS-NC's failure to satisfy the self-insured retention under the Atlantic Policy.

26. Atlantic now seeks a judicial declaration that the Atlantic Policy is not triggered and there is no coverage under it until BCBS-NC exhausts its $5 million retention by its own payments for covered loss under the Atlantic Policy. Atlantic further seeks a judicial declaration on its coverage defenses, namely that the MDL Action is related to earlier litigation first noticed and pending prior to the inception of the Atlantic Policy (the "Related Claims" provision and the "Prior and Pending Litigation Exclusion"). To the extent there is no coverage for the MDL Action, Atlantic also seeks a judicial declaration that it is entitled to reimbursement for defense expenses advanced to BCBS-NC.

27. Atlantic also seeks specific performance from Federal pursuant to the Defense Agreement, or, in the alternative, the return of the $600,000 Atlantic paid to Federal on account of Federal's repudiation of the Defense Agreement. Atlantic further seeks a declaration that once its Policy is triggered, Atlantic is owed contribution from Federal for all reasonable defense expenses incurred by BCBS-NC and indemnity for any potential settlement or judgment of the MDL Action.

28.     Per the terms of the Atlantic Policy, because Atlantic has issued payment under its Policy, Atlantic is also subrogated to the rights of BCBS-NC to recover against any person or entity.  Atlantic therefore seeks a judicial declaration that it has the right to seek recovery from any other entities responsible for BCBS-NC's defense expenses and/or indemnity in the MDL Action, including, but not limited to, Federal and the Blue Cross Blue Shield Association (the "Association" or "BCBSA")

29.     In addition, Atlantic has been investigating coverage for the antitrust class actions since their inception in 2012 and for the MDL Action following the MDL Transfer Order in December of 2012.  As the parties to the MDL Action explore informal resolution, Atlantic has been and will continue to be asked to evaluate coverage for any potential settlement or judgment.  Throughout its investigation, Atlantic has requested clearly relevant information necessary for it to: (1) assess BCBS-NC's potential liability in the class action lawsuits consolidated in the MDL Action; and (2) make determinations regarding coverage.

30.     Rather than comply with Atlantic's requests, BCBS-NC has, through its coverage counsel, refused to provide the majority of the requested information and has taken the position that Atlantic's requests are covered by the mediation privilege, or that Atlantic is simply not entitled to them.  As to many of the documents, BCBS-NC's coverage counsel claims disclosure is barred by the attorney-client privilege and/or work product doctrine.

31.     As a result, Atlantic has been forced to file this action to, among other things, seek the Court's determination of the scope and meaning of the cooperation clause and to enforce Atlantic's rights under it.  Atlantic also seeks a judicial determination that BCBS-NC breached the Atlantic Policy by repeatedly failing to provide the requested information and documents, and that this breach precludes coverage.  Alternatively, Atlantic seeks specific performance under its Policy in the form of an order requiring BCBS-NC to provide the requested information and to comply with future reasonable requests.

32.     BCS is joined pursuant to Federal Rule of Civil Procedure 19(a)(1)(B)(i) and (ii) as its E&O and D&O Policies follow form to the Atlantic and Federal Policies, respectively.  BCS therefore has a material interest in the subject matter of the case and is needed for just adjudication.  Its involvement will assure that any judgment rendered will provide complete relief to the existing parties and prevent repeated lawsuits on the same subject matter.

## **Nature of the Action**

33.     This action is brought pursuant to 28 U.S.C. § 2201, which provides that the Court may declare the rights and other legal relations of the parties.  An actual controversy of a judicial nature exists between Atlantic and BCBS-NC involving the parties' rights and liabilities under the Atlantic Policy.  The construction of the Atlantic Policy and the controversy existing between Atlantic and BCBS-NC may be determined by a judgment of this Court.

34.     An actual controversy of a judicial nature also exists between Atlantic and Federal involving the parties' rights and obligations under their respective Policies. The controversy existing between Atlantic and Federal may be determined by a judgment of this Court.

35.     This action also seeks specific performance to remedy BCBS-NC's breach of the cooperation clause in the Atlantic Policy.

## FACTUAL BACKGROUND OF UNDERLYING ACTIONS

## The MDL Action

36.     In 2012, a number of class action complaints were filed against multiple Blue Cross Blue Shield entities or member plans ("BCBS" or the "Blues") and the Association alleging violations of antitrust laws. The lawsuits allege generally that the Blues and the Association conspired to leverage their economic power and market dominance to under-compensate healthcare providers for their services and to increase healthcare costs to subscribers by coordinating their operations and limiting their activities through, among other things, restrictions in their trademark licenses.

37.     On December 12, 2012, the Judicial Panel on Multidistrict Litigation consolidated and transferred such actions to the United States District Court for the Northern District of Alabama, creating the MDL litigation referred to as *In Re: Blue Cross Blue Shield Antitrust Litigation*, Master File No 2:13-cv-20000-RDP ("MDL Action") [USJPML Dkt. 128] ("MDL Transfer Order"). In consolidating the individually filed class actions, the MDL Panel found: "Here, the actions involve substantial common

questions of fact relating to the state BCBS entities' relationship with the national association, BCBSA, and the licensing agreements that limit the Blue Plans' activity to exclusive service areas, among other restrictions."

38.     Pursuant to an Order issued by the MDL Court, two consolidated complaints were filed in the MDL Action, one for the "Subscriber Track" and the other for the "Provider Track." (Subscriber Track Third Amended Consolidated Class Action Complaint (the "Subscriber Complaint") [MDL Action Dkt. 1082] and Consolidated Fourth Amended Provider Complaint (the "Provider Complaint") [MDL Action Dkt. 1082]).

39.     BCBS-NC is named as a defendant in the Provider and Subscriber Complaints.   The Provider Complaint also includes as a defendant unspecified subsidiaries and affiliated companies of BCBS-NC.

40.     The Provider Complaint alleges that the Blues have been engaged for many years in an agreement not to compete against one another, but instead to cooperate and coordinate their activities on a nationwide basis in order to maximize their profits.  The Provider Complaint contends that the Blues agreed to cease competing and to impose operational uniformity on themselves decades ago by carving out exclusive service areas, setting up their national programs (including Blue Card), and establishing BCBSA's uniform rules and regulations.   The Blues allegedly formalized their cooperation agreement through the restrictions in their trademark licenses, such as the requirement of mandatory participation in the national programs.

41.     The asserted conspiracy has allegedly perpetuated and strengthened the dominant market position each Blue enjoys in its specifically defined geographic market which, in turn, has enabled the Blues to force healthcare providers to accept anticompetitive rates and terms.  The Provider Complaint alleges that healthcare providers have been subjected to lower rates and less favorable terms than would have been the case in the absence of the conspiracy.

42.     The Provider Complaint seeks injunctive relief prohibiting the Blues, including BCBS-NC, from entering into, honoring, or enforcing any agreements that restrict territories or geographic areas, enjoining the Blues from utilizing the Blue Card Program to pay healthcare providers, and enjoining the Blues from developing any other program or structure that is intended to fix, or has the effect of fixing, prices paid to healthcare providers.  The Provider Complaint also seeks relief in the form of treble damages.

43.     The Subscriber Complaint similarly alleges that the Blues have been engaged for many years in an agreement not to compete against one another, but instead to cooperate and coordinate their activities on a nationwide basis in order to maximize their profits.  The Subscriber Complaint alleges that the Blues agreed to cease competing and to impose operational uniformity on themselves decades ago by carving out exclusive service areas and establishing BCBSA's uniform rules and regulations, including BCBSA's Membership Standards and Guidelines.  The Blues allegedly formalized their cooperation agreement in their trademark licenses.

44.    The Subscriber Complaint seeks injunctive relief prohibiting the Blues, including the BCBS-NC entities, from entering into, honoring, or enforcing any agreements that restrict territories or geographic areas, and it also seeks to eliminate restrictions on the Blues' activities.  The complaint further seeks relief in the form of treble damages of the amount by which the plaintiffs allege premiums were artificially inflated above their competitive levels.

45.    The Provider Complaint and the Subscriber Complaint are based upon the same or related conduct of the Blues relating to the Blues' "relationship with the national association, BCBSA, and the licensing agreements that limit the Blue Plans' activity . . . " MDL Transfer Order, page 2.  The Provider and Subscriber Complaints differ only with respect to the alleged harm to the providers and the subscribers.  Both complaints seek damages in excess of this Court's jurisdictional limit and invoke federal question jurisdiction.

46.    Atlantic seeks a judicial declaration that the claims submitted with respect to the Provider Track and the Subscriber Track are Related Claims under the Atlantic Policy.  BCBS-NC's contention that Atlantic owes a duty to defend once $5 million in defense expenses have been incurred implies that BCBS-NC is treating the Provider and Subscriber claims as though they are Related Claims under the Atlantic Policy.  To the extent the Provider and Subscriber claims are not Related, Atlantic seeks a judicial declaration that BCBS-NC must satisfy two retentions, or pay $10 million of covered loss, before the Atlantic Policy is triggered.

## The Prior Related Lawsuit

47.     BCBS-NC, its subsidiaries and health care plans were also defendants in a prior class action litigation styled *Love v. Blue Cross Blue Shield Assoc. et al.*, No. 03-21296 (S.D. Fla.) (originally titled *Thomas v. Blue Cross Blue Shield Assoc.*).  *Love* was a component of an MDL proceeding created in April 2000, and styled *In re Managed Care Litigation*, No. 1:00-MDL-1334 (collectively referred to as the "*Love* Litigation") [*Love* Litigation Dkt. 786].

48.     Like the present pending MDL Action, the *Love* Litigation was based on the theory that the Blues for many years have not competed against one another, but instead have engaged in an agreement to cooperate and coordinate their activities on a nationwide basis in order to maximize their profits.

49.     The *Love* Litigation plaintiffs alleged that the Blues are not competitors, but instead provide health services only in individual distinct geographic regions, and that the individual Blues have market power in their respective regions.  The *Love* Litigation plaintiffs further alleged that the Blues use their market power to harm providers by forcing them to accept unfavorable reimbursements.

50.     The *Love* Litigation plaintiffs also contended that the Blues agreed to cease competing and to impose operational uniformity on themselves decades ago by agreeing to operate in distinct geographic regions (Exclusive Service Areas), setting up their national programs (including Blue Card), and establishing BCBSA's uniform rules and regulations.

51. The *Love* Litigation plaintiffs further contended that the Blues formalized their alleged cooperation agreement in their trademark licenses. The *Love* Litigation cites the absence of Blue-on-Blue competition – and the resulting market dominance each Blue has acquired as a result – as well as the operational uniformity among the Blues required by their trademark licenses (including the requirement of mandatory participation in the Blue Card Program) as evidence that the Blues have conspired.

52. The *Love* Litigation plaintiffs asserted, among other things, that the Blues engaged in a common scheme to systematically diminish payments to providers. Similar to the Provider and Subscriber Complaints, the *Love* litigation was based on the restrictions in the Blues' trademark licenses, on the Blues' relationship with BCBSA, and on the Blues' long history and practice of national coordination and cooperation.

53. Many of the Blues, including BCBS-NC, settled the *Love* Litigation through three settlement agreements that became effective on September 28, 2006, October 3, 2008, and June 19, 2009, respectively.

## The Prior Related *Musselman* Lawsuit

54. BCBS-NC, its subsidiaries and health care plans were also defendants in a subsequent action styled *Musselman v. Blue Cross Blue Shield of Ala.*, et al., no. 13-20050 (S.D. Fla.) (the "*Musselman* Complaint"), in which plaintiffs sought a declaration that the claims in the MDL Action were not released by the settlement agreements with the Blues, including BCBS-NC, in the *Love* Litigation. The Blues moved to dismiss the *Musselman* Complaint.

55.     The District Court granted the Blues' Motion to Dismiss finding that the claims in the *Musselman* Complaint were related to and released by the settlement agreements in the *Love* Litigation, thus barring further litigation. [*Musselman* Dkt. 66]

56.     On the plaintiffs' appeal of the dismissal, the Blues, including BCBS-NC, contended that the allegations in the *Musselman* Complaint involve the same allegations as those made in the *Love* Litigation.

57.     On appeal, the Blues specifically claimed the antitrust claims asserted in *Conway v. Blue Cross Blue Shield of Alabama, et al.* ("*Conway*") (one of the actions consolidated in the MDL Action) involve the same allegations made in the *Love* Litigation.  According to the Blues, *Love* "was based on the theory that the Blue Plans have conspired for years to undercompensate physicians for their services."  The Blues pointed to the following allegations made in *Love* to support their contention that *Love* asserted the same claims made in the MDL Action [*Conway* Appeal Case No. 13-14250 (11th Cir.) Dkt. 53]:

a.  <u>Geographic Limitations:</u> The *Love* plaintiffs alleged that individual Blue Plans only provide health services on a statewide or regional basis.

b.  <u>Market Power:</u> The *Love* plaintiffs alleged that individual Blue Plans had market power in their respective markets.

c.  <u>Coercive Use of Market Power:</u> The *Love* plaintiffs alleged that Blue Plans used their market power to harm providers, including by forcing them to agree to unfavorable terms.

d. <u>BCBSA:</u> The *Love* plaintiffs alleged that BCBSA was central to the conspiracy they alleged.

e. <u>BlueCard:</u> The *Love* plaintiffs alleged that the BlueCard program was an integral part of the conspiracy. They described BlueCard as "a mandatory nationwide program in which all Blue licensees are required to participate and which is designed to allow Blue Cross Blue Shield members who are traveling in another Plan's service area to receive the healthcare service benefits of their home Plan." Mot. for Class Cert. at 24 (*Love* D.E. 498) They claimed that BCBSA and individual Blue Plans "were able to utilize this network to pass along the network discounts the 'host' or local Plan had negotiated with its providers" to the other Blue Plans.

58. The Blues went on to assert that the claims in *Conway* (i.e., the MDL Action):

> are asserted "by reason of, arising out of, or in any way related to" these very same allegations [as *Love*]. For example, *Love*'s allegations about market power and geographic limitations lie at the very heart of the *Conway* complaint, which alleges that an antitrust conspiracy among the Blue Plans has "perpetuated and strengthened the dominant market position each BCBS plan enjoys in its specifically defined geographic market." *Conway* Compl. (Suppl.Appx. F) ¶ 4. *Conway* likewise recycles *Love*'s allegations about the Blue Plans' abuses of market power, claiming that Blue Plans have used their market power to force healthcare providers to accept anticompetitive rates and terms, with the result that healthcare providers have received lower reimbursement rates and less favorable contract terms than they would have received without the alleged conspiracy. *See, e.g., id.* ¶¶ 6-8, 130.

> The conspiracy alleged in *Conway* also involves the same mechanisms as the conspiracy alleged in *Love*. For example, as in *Love*, the conspiracy

alleged in *Conway* supposedly was implemented through BCBSA. *See generally id.* ¶¶ 70- 96; *see also id.* ¶ 96 (alleging that BCBSA "facilitates the cooperation and communications between the Blues to suppress competition within their respective areas of operation" and "is a convenient organization through which the Blues entities can enter into patently illegal territorial restraints between and among themselves"). And just like in *Love*, the BlueCard program is alleged to be an integral part of the conspiracy at issue in *Conway*. In fact, the Amended Complaint in *Conway* asserts a price fixing claim under the Sherman Act based solely on the BlueCard program. *See Conway* Am. Compl. (Appx. B) ¶ 232 (alleging that "[t]hrough the BCBS Price Fixing Conspiracy, the Blues have agreed to fix reimbursement rates for providers among themselves by agreeing to accept the 'host plan' reimbursement rate through the Blue Card Program").

59.    A different District Court has already highlighted the inconsistency between the Blues' position in *Musselman* and the position that coverage is available for the MDL Action claims.

60.    In 2017, another insurer filed coverage litigation against Independence Blue Cross ("Independence") in the United States District Court for the Eastern District of Pennsylvania styled *Allied World Specialty Insurance Company v. Independence Blue Cross LLC,* No. 2:17-cv-01463-JS (E.D. Pa.). The Independence action involves a similar coverage dispute related to the claims in the MDL Action under Independence's insurance program. Independence is another Blue and a co-defendant of BCBS-NC in the MDL Action.

61.    In the Independence action, the insurer's complaint seeks, among other things, a declaration that substantially similar Related Claims and Prior and Pending Litigation Exclusion provisions in the policy at issue there preclude coverage for the

MDL Action. Unsurprisingly, Independence, like BCBS-NC, took the position that the policy does provide coverage for the MDL Action.

62. Nonetheless, Independence filed a Motion to Dismiss, arguing that the coverage litigation is premature because the insurer's coverage obligations depend on the outcome of claims that have yet to be resolved in MDL Action. The court, finding the issues were ripe for review, denied that Motion to Dismiss. [*Independence* Dkt. 35].

63. In so doing, the court recognized the impact of *Musselman,* stating:

> [T]he Court is not persuaded a potential conflict in litigating both actions weighs in favor of dismissal. As an example of such a conflict, Independence admits it has taken inconsistent positions in the *Musselman* action and in the instant action, as it argued in *Musselman* that allegations in the MDL Action involve the same allegations as those made in *Love*, thereby releasing the claims in the MDL Action and barring further litigation. Such arguments now work against Independence, as they tend to admit that the plaintiffs' allegations in the MDL Action arise out of and are related to the allegations in *Love*. Independence fails to demonstrate, however, how that conflict, or any other potential conflict, would prejudice its defense in the MDL Action.

[*Independence* Dkt. 35], pg. 9 fn. 5.

64. Moreover, *Musselman's* application to the MDL Action was confirmed on October 17, 2018 when Judge R. David Proctor denied the Provider Plaintiffs' Motion for Partial Summary Judgment against Certain Defendants That Were Not Signatories to Settlement Agreements in *Love*. [MDL Action Dk. 2324].

65. In so finding, the court fully adopted Judge Federico A. Moreno's description of the prior *Love* litigation in the *Musselman* Order granting the Blues' Motion to Dismiss:

> "This MDL [1334] case concerned, *inter alia*, reimbursement for health care services by managed care companies and was divided into two tracks: one involving broad claims by health care providers and the other involving broad claims by subscribers to health care plans. The provider track, *i.e., Love*, was a class action brought on behalf of all providers who submitted claims to health care companies, including the [defendants in *Conway v. Blue Cross Blue Shield of Alabama*, Case No. 2:12-cv-02532 (N.D. Ala.),[1]] for the provision of medical services." *Musselman v. Blue Cross & Blue Shield of Alabama*, 2013 WL 4496509, at *1 (S.D. Fla. Aug. 20, 2013), aff'd, 684 F. App'x 824 (11th Cir. 2017)

[MDL Action Dk. 2324], pg. 2.

66.     Judge Proctor, acknowledging the *Love* litigation's relatedness to the claims in the MDL Action, "agree[d] with Judge Moreno 'that the *Conway* claims [one of the complaints consolidated in the MDL Action] are Released Claims' under the *Love* Settlement."

### BCBS-NC's Further Judicial Admissions on Relatedness

67.     BCBS-NC has admitted the relatedness of *Love* in other litigation. In seeking to enforce injunctions while the *Love* settlement was pending, BCBS-NC sought to dismiss several subsequently filed lawsuits on the basis they were released under the *Love* settlement. With respect to one such subsequently filed case, *Powderly, et al. v. Blue Cross and Blue Shield of North Carolina, et al.*, Case No. 3:08-cv-109 (W.D. NC), BCBS-NC argued as follows concerning the nature and scope of claims made in *Love*:

---

[1] *Conway v. Blue Cross and Blue Shield of Alabama et al.*, Case No. 2:12-cv-02532-RDP, is one of the prioritized Provider cases in this litigation, *In Re Blue Cross Blue Shield Antitrust Litigation* MDL 2406. (DE 575).

For over four years, the parties, including the Settling Defendants, litigated, mediated, and negotiated to resolve the broad range of claims raised by the *Love* complaint.

\* \* \*

The *Love* Settlement Agreement is a global settlement that forever discharges and releases all class members' claims relating to claims processing and payment, assignment of benefits, and physician contracting and network disputes that arose prior to its Effective Date. **That includes claims of a conspiracy relating to "in-network" status, which the *Love* complaint refers to as physician contracting and "black-listing" (*i.e.,* denial of network status).** For example, the *Love* complaint alleges that the conspiracy was "conducted and implemented by the sharing and dissemination of . . . physician contracting information through meetings conducted by the Blue Cross and Blue Shield Association." (D.E. 786 at ¶37). [fn. 6: In their Motion for Class Certification (D.E. 864-1), the *Love* plaintiffs describe the conspiracy defendants allegedly effectuated through use of the BlueCard Program and committees, such as the Inter-Plan Program committee.] Regarding the denial of in-network status or "black-listing," the *Love* plaintiffs alleged:

> **Defendants control a large percentage of subscribers and providers in the managed care market in most states and some local areas. In order to perpetuate their scheme, Defendants use their overwhelming economic power and market dominance to coerce Individual Plaintiffs and/or the class,** *at the risk of being denied patient referrals and/or "black-listed" altogether, into providing care ... on a "take it or leave it" basis... Id.* at ¶¶ 282-283

\* \* \*

The *Love* action involved broad-based claims.  The Settlement Agreement, therefore, was similarly broad in scope.  (Bold emphasis added, italics in original.)

[*Love* Litigation Dkt. 1504] (citation on pgs. 2, 7-8 and 11).

68.     Similarly, the Fourth Amended Provider Complaint in the MDL Action

alleges nearly the exact same wrongful conduct:

> The Blues' anticompetitive agreements make them very different from other insurers.  If an insurer like UnitedHealthcare wants to establish a

provider network, its value proposition to a provider includes its ability to steer its enrollees to that provider. And a provider who is thinking about leaving the network knows that the consequence is the inability to treat UnitedHealthcare's enrollees on an in-network basis. Each Blue, on the other hand, brings not only its own enrollees, but also the enrollees of every other Blue into negotiations with providers. (**"Negotiation" is a bit of a misnomer, as the Blues can offer contracts on a take-it-or-leave it basis**.) And a provider who is thinking about leaving the local Blue's network knows that the consequence is not just the inability to treat the local Blue's enrollees on an in-network basis, but the inability to treat all of the Blues' enrollees on an in-network basis. Thus, the Blues are able to use leverage against providers that is unavailable to their competitors. (Bold emphasis added).

[MDL Action Dkt. 1082], ¶ 224.

69.     BCBS-NC has already judicially admitted what is necessary to find BCBS-NC's MDL Action a Claim Related to *Love* and excluded by the Prior and Pending Litigation Exclusion: a common scheme with a common goal, and common facts in the prior and current claims – i.e., health insurance market dominance across states with distinct entities that conspire with each other to offer contracts on a "take it or leave it" basis.

## THE INSURANCE POLICIES

### The Atlantic Policy

70.     Atlantic issued a primary Managed Care Errors and Omissions Liability Insurance Policy, Policy No. MCR-5397-12 to BCBS-NC for the policy period January 1, 2012 through January 1, 2013, that provides certain coverage to BCBS-NC in excess of this Court's jurisdictional threshold pursuant to the policy's terms, conditions, and exclusions). The Atlantic Policy has a maximum limit of liability of $10 million for each claim and in the aggregate for all claims, as well as a $5 million retention for each claim

pursuant to the policy's terms, conditions and exclusions. A copy of the Atlantic Policy is attached as **Exhibit 1**.

71.     The Atlantic Policy provides the following coverage:

**We** will pay on **your** behalf **Damages** and **Claim Expenses** in excess of the Retention that **you** are legally obligated to pay as a result of a **Claim** for:

**(A)**     an act, error, or omission, or series of acts, errors, or omissions, committed or allegedly committed by **you** or on **your** behalf in the performance of a **Managed Care Activity;**

**(B)**     **Antitrust Activity** by **you** or on **your** behalf in the performance of a **Managed Care Activity**;

**(C)**     **Vicarious Liability** for an act, error, or omission, or series of acts, errors, or omissions, by a person or entity other than **you** in the performance of a **Managed Care Activity**;

**(D)**     **Vicarious Liability** for an act, error, or omission, or series of acts, errors, or omissions, by a person or entity other than **you** in rendering, or failing to render, **Medical Services**; and

**(E)**     **Privacy Liability**;

provided that such **Claim** is first made against **you** during the **Policy Period** or applicable Extended Reporting Period and reported to **us** in accordance with Section VII Your Reporting Obligations of this Policy.

(Atlantic Policy, § I What This Policy Covers.)

72.     The Atlantic Policy contains the following Exclusion (A):

No coverage will be available under this Policy for any **Claim**, **Damages**, or **Claim Expenses**:

**(A)**     based upon or arising out of any:

(1)     dishonest, fraudulent, criminal, or malicious act, error, or omission committed or allegedly committed by, or on behalf of, or in the name or right of, or for the benefit of any of **you**;

(2)      willful violation of any local, state, federal, or foreign act, statute, rule, regulation, requirement, ordinance, common law, or other law by, or on behalf of, or in the name or right of, or for the benefit of any of **you**; or

(3)      gaining of any profit, remuneration, or advantage to which any of **you** is not legally entitled;

provided that: (a) for the purpose of determining the applicability of this Exclusion, no act, error, or omission committed or allegedly committed by any of **you** will be imputed to any other of **you** who was not aware of and did not participate in the act, error, or omission; and (b) this Exclusion shall not apply to **Claim Expenses** unless the act, error, or omission has been established by a final adjudication of the **Claim**, a final adjudication in any judicial or other proceeding, or an admission by any employee, director, officer, or other representative of any **Named Insured** appointed, authorized, or otherwise empowered to bind **you**;

(Atlantic Policy, § II What This Policy Excludes (A).)

73.    The Atlantic Policy contains the following Exclusion (D):

No coverage will be available under this Policy for any **Claim**, **Damages**, or **Claim Expenses**:

**(D)**    based upon or arising out of any:

(1)      actual or alleged act, error, or omission if, before the Inception Date of this Policy stated in the Declarations, **you** knew or should reasonably have known that the act, error, or omission would give rise to a **Claim**;

(2)      actual or alleged act, error, or omission that, before the Inception Date of this Policy stated in the Declarations, was the subject of any notice under any prior or concurrent policy; or

(3)      prior or pending litigation or administrative, regulatory or other proceeding against any of **you** as of the Inception Date of this Policy, or the same or substantially the same act, error, or omission underlying or alleged therein;

provided that if this Policy is a renewal of one or more policies previously issued by **us** to the **Named Insured**, and the coverage provided by **us** to the **Named Insured** was in effect, without interruption, for the entire time between the inception date of the first such other policy and the Inception Date of this Policy, the reference in this Exclusion to the Inception Date will be deemed to refer instead to the inception date of the first policy under which **we** began to provide the **Named Insured** with the continuous and uninterrupted coverage of which this Policy is a renewal;

(Atlantic Policy, § II What This Policy Excludes (D).)

74.     The Atlantic Policy contains the following Exclusion (E):

No coverage will be available under this Policy for any **Claim**, **Damages**, or **Claim Expenses**:

**(E)**     based upon or arising out of any **Claim** made against any of **you** for any act, error, or omission committed or allegedly committed during any time when **you** were not an **Insured Person** or a **Named Insured**;

(Atlantic Policy, § II What This Policy Excludes (E).)

75.     The Atlantic Policy contains the following Exclusion (K):

No coverage will be available under this Policy for any **Claim**, **Damages**, or **Claim Expenses**:

**(K)**     for any actual or alleged express or assumed liability of any of **you** under any indemnification agreement; provided that this Exclusion will not apply to liability that would have attached to **you** in the absence of such agreement and is otherwise covered under this Policy.

(Atlantic Policy, § II What This Policy Excludes (K).)

76.     The term "**Antitrust Activity**" is defined as " any actual or alleged: price fixing; restraint of trade; price discrimination; predatory pricing; monopolization; unfair

business practices; or violation of the Federal Trade Commission Act of 1914, the Sherman Antitrust Act of 1890, the Clayton Act of 1914, any similar state, federal, or local antitrust statute or law." (Atlantic Policy, § III Definition (A).)

77. The term "**Claim**" is defined as:

**Claim** means any written demand (including a written demand in electronic form) from any person or entity seeking money or services or civil, injunctive, or administrative relief from **you**. **Claim** does not include:

(1) any demand or other notice for an internal review or appeal of or under any of **your** policies, practices, procedures, systems, or rules; or

(2) any audit, investigation, or subpoena, including but not limited to any audit, investigation, or subpoena by, or on behalf of, or in the name or right of, or for the benefit of any local, state, federal, or foreign administrative, governmental, or regulatory agency, body, entity, or tribunal.

A **Claim** will be deemed to have been first made against **you** when it is first received by **you**.

(Atlantic Policy, § III Definition (C).)

78. The term "**Claim Expenses**" is defined as:

**Claim Expenses** means the reasonable and necessary legal and expert fees and expenses incurred in the investigation, adjustment, defense or appeal of any **Claim**, including the costs of electronic discovery and, with **our** prior written consent, public relations consultant expenses. **Claim Expenses** does not include:

(1) any remuneration, salary, wage, fee, expense, overhead, or benefit expense of any of **you**;

(2) any fee, cost, or expense incurred prior to the time that a **Claim** is first made against any of **you** or incurred in pursuing any claim, counterclaim, cross-claim, or other relief brought or maintained by, or on behalf of, or in the name or right of, or for the benefit of any of **you**; or

(3)     any fine, penalty, forfeiture, sanction, tax, or fee.

(Atlantic Policy, § III Definition (D).)

79.     The term "**Claim Services**" is defined as "the following services, but only if performed by **you** or on **your** behalf: the submission, handling, investigation, adjudication, denial, payment, or adjustment of claims for benefits or coverages under health care, consumer directed health care, behavioral health, prescription drug, dental, vision, long or short term disability, automobile medical payment, or workers' compensation plans." (Atlantic Policy, § III Definition (E).)

80.     The term "**Damages**" is defined as:

**Damages** means any settlements, judgments, pre-judgment interest, post-judgment interest, claimant's attorney's fees in an amount equal to the percentage that any **Damages** covered under this Policy for any settlement or judgment bear to the total amount of such judgment or settlement, or other amounts (including punitive, multiple, or exemplary damages if insurable under the **Law Most Favorable to Insurability**) which **you** are legally obligated to pay as a result of a **Claim**. **Damages** does not include:

(1)     any fine, penalty, forfeiture, sanction, tax, fee, liquidated damages, or amount imposed by statute, rule, regulation, or other law; provided that **Damages** will include fines or penalties which you are legally obligated to pay as a result of a **Claim** for **Antitrust Activity** or a **Claim** for a "HIPAA Violation", if such fine or penalty is insurable under the **Law Most Favorable to Insurability**;

(2)     any non-monetary or equitable relief or redress, including but not limited to any cost or expense of complying with any injunctive, declaratory, or administrative relief or specific performance award;

(3)     any payment, restitution, return, or disgorgement of any fee, profit, royalty, premium, commission, or charge, or any fund allegedly wrongfully or unjustly held or obtained, including but not limited to

any profit, remuneration or advantage to which **you** were not legally entitled;

(4)    any amount any of **you** pay or may be obligated to pay under any contract or agreement, including but not limited to any policy, bond, benefit plan, or provider agreement;

(5)    any loss, cost, or expense of correcting, changing, modifying, or eliminating any policy, practice, procedure, system, or rule; or

(6)    any matter that is uninsurable under applicable law.

(Atlantic Policy, § III Definition (F), as amended by Endorsement No. 9.)

81.    The term "**Law Most Favorable to Insurability**" is defined as "the applicable law most favorable to the insurability of the applicable **Damages**, which shall be the law of the jurisdiction where the actual or alleged act, error, or omission giving rise to liability took place, the applicable **Damages** were awarded, the **Named Insured** is incorporated or has its principal place of business, or **we** are incorporated or have **our** principal place of business." (Atlantic Policy, § III Definition (H).)

82.    The term "**Managed Care Activity**" is defined as

**Managed Care Activity** means any of the following services or activities, whether provided on paper, in person, electronically, or in any other form and whether performed by **you** or on **your** behalf: **Provider Selection**; **Utilization Review**; **Quality Improvement Organization Programs**; advertising, marketing, selling, or enrollment for health care, consumer directed health care, behavioral health, prescription drug, dental, vision, long or short term disability, automobile medical payment, or workers' compensation plans; **Claim Services**; establishing health care provider networks including tiered networks; provision of information with respect to tiered networks, including cost and quality information regarding specific providers, services, or charges; reviewing the quality of **Medical Services** or providing quality assurance; design or implementation of financial incentive plans; design or implementation of **Pay for Performance Programs**; wellness or health promotion education;

development or implementation of clinical guidelines, practice parameters or protocols; triage for payment of **Medical Services**; calculation of medical loss ratio and related distribution; services or activities performed in the administration or management of health care, consumer directed health care, behavioral health, prescription drug, dental, vision, long or short term disability, automobile medical payment, or workers' compensation plans; and generating estimates for Blue Cross Blue Shield of North Carolina's clients of projected reimbursement amounts for early retirees including eligible spouses, surviving spouses, and dependents for the first two plan year cycles to assist in the client's application for the Early Retiree Reinsurance Program established by the "Patient Protection and Affordable Care Act."

(Atlantic Policy, § III Definition (I), as amended by Endorsement No. 3.)

83.    The term "**Named Insured**" is defined as "the entity designated in the Declarations (the "first **Named Insured**") [Blue Cross Blue Shield of North Carolina] and each other entity listed as a **Named Insured** by endorsement to this Policy." (Atlantic Policy, § III Definition (K) and Declarations, Item 1.)    Additional **Named Insureds** are listed in Endorsement No. 1.

84.    The term "**Policy Period**" is defined as "the period from the Inception Date of this Policy stated in the Declarations [January 1, 2012] to the Expiration Date of this Policy stated in the Declarations [January 1, 2013] or to any earlier cancellation or termination of this Policy." (Atlantic Policy, § III Definition (N) and Declarations, Item 2.)

85.    The term "**Related Claims**" is defined as "all **Claims** based upon or arising out of the same or related acts, errors, omissions, or course of conduct or the same or related series of acts, errors, omissions, or course of conduct." (Atlantic Policy, § III Definition (R).)

86.     **Related Claims** are treated as follows under the Atlantic Policy:

All **Related Claims** will constitute a single **Claim** regardless of: (A) the number, identity, or addition of parties, theories of liability, or requests for relief; (B) the number or timing of the **Related Claims**, even if the **Related Claims** were made in more than one policy period; or (C) whether the **Related Claims** are asserted in a class action or otherwise. All **Related Claims** will be treated as a single **Claim** made when the earliest of the **Related Claims** was first made against **you** or is treated as having been first made in accordance with Section VII Your Reporting Obligations of this Policy, whichever is earlier.

(Atlantic Policy, § VI How We Will Treat Related Claims.)

87.     The terms "**We, us,** and **our**" mean "the Underwriting Company as set forth in the Declarations of this Policy [Atlantic Specialty Insurance Company]."

(Atlantic Policy, § III Definition (U) and Declarations.)

88.     The terms "**You**" and "**Your**" mean:

(1)     any **Named Insured**; and

(2)     any **Insured Person**.

(Atlantic Policy, § III Definition (V).)   Additional Insured entities forming part of the definition of "**You**" and "**Your**" under certain circumstances are also listed in Endorsement No. 2.

89.     The Atlantic Policy includes the following Limit of Liability provision (A):

**Each Claim Limit of Liability.** The amount stated as the Each Claim Limit of Liability in the Declarations will be **our** maximum Limit of Liability for all **Damages** and all **Claim Expenses** from each **Claim** or **Related Claims** for which this Policy provides coverage.  This Limit of Liability will be part of, and not in addition to, the Policy Aggregate Limit of Liability stated in the Declarations.

(Atlantic Policy, § V Limits of Liability and Retention (A).)

90.     The Atlantic Policy includes the following Limit of Liability provision (B):

**Policy Aggregate Limit of Liability.** The amount stated as the Policy Aggregate Limit of Liability in the Declarations will be **our** maximum aggregate Limit of Liability for all **Damages** and all **Claim Expenses** from all **Claims** and all **Related Claims** for which this Policy provides coverage.

(Atlantic Policy, § V Limits of Liability and Retention (B).)

91.     The Atlantic Policy includes the following Limit of Liability provision (C):

The applicable Limits of Liability described in this Policy will apply regardless of the time of the payment under this Policy, the number of persons or entities included within the definition of **you**, or the number of **Claims** or acts, errors, or omissions under this Policy.

(Atlantic Policy, § V Limits of Liability and Retention (C).)

92.     The Atlantic Policy includes the following Limit of Liability provision (D):

**Claim Expenses** are part of, and not in addition to, the applicable Limits of Liability, and payment of **Claim Expenses** by **us** will reduce, and may exhaust, the applicable Limits of Liability.

(Atlantic Policy, § V Limits of Liability and Retention (D).)

93.     The Atlantic Policy includes the following Limit of Liability provision (E):

**We** will have no obligation to pay **Damages** or **Claim Expenses** after the applicable Limit of Liability has been exhausted by payments by **us**. If the Policy Aggregate Limit of Liability stated in the Declarations is exhausted by payments by **us**, the premium for this Policy will be fully earned, all of **our** obligations under this Policy will be completely fulfilled and exhausted, and **we** will have no further obligations of any type, nature, or kind under this Policy.

(Atlantic Policy, § V Limits of Liability and Retention (E).)

94.     The Atlantic Policy includes the following Retention provision (F):

**Retention. You** will be responsible for payment in full of the amount stated as the Retention in the Declarations, which will apply to **Damages** and **Claim Expenses** from each **Claim** for which this Policy provides coverage. **Our** obligation to make any payment under this Policy for any **Claim** will be excess of the Retention. If **you** are unable or unwilling to pay the full

amount of the Retention, the **Named Insured** will be responsible for payment in full of the Retention on **your** behalf. **We** have no obligation whatsoever to pay any portion of the Retention; however, **we** may choose to pay a portion of the Retention, in which case **you** will repay **us** any amounts paid by **us**, and the amounts paid will be credited against and will reduce the applicable Limits of Liability unless and until they are repaid in full by **you**. **Your** inability to pay, failure to pay, or refusal to pay any portion of the Retention will not alter or increase **our** obligations under the Policy.

(Atlantic Policy, § V Limits of Liability and Retention (F).)

95.     The Atlantic Policy includes the following provision concerning the right and duty to defend prior to exhaustion of the Retention:

**You** have the right and duty to defend a covered **Claim** until the Retention for the **Claim** is exhausted.  **You** also have the right and duty to settle, and otherwise pay **Damages** and **Claim Expenses** as a result of a covered **Claim** up to the amount of the Retention.  At **our** own cost, we have the right to investigate or associate in the defense of, a covered **Claim** that **you** are defending.

(Atlantic Policy, § IV How Claims Will Be Handled (A), as amended by Endorsement No. 8.)

96.     The Atlantic Policy includes the following provision concerning the right and duty to defend upon exhaustion of the Retention:

Upon exhaustion of the Retention with respect to a covered **Claim**, **we** assume the right and duty to defend the **Claim**, including but not limited to the right to select counsel to represent **you** in connection with the **Claim**; provided that **we** will not unreasonably replace counsel previously selected by **you**.  **We** have the right to investigate, direct the defense, and conduct negotiations and, with **your** consent which will not be unreasonably withheld, enter into a settlement of the **Claim**.

(Atlantic Policy, § IV How Claims Will Be Handled (B), as amended by Endorsement No. 8.)

97.     The Atlantic Policy includes the following consent provision:

**You** will not, except at **your** own cost, settle any **Claim**, incur any expense, make any payment, admit any liability, or assume any obligation with respect to any **Claim**, that will exceed, is reasonably likely to exceed, or has exceeded the Retention without **our** prior written consent, and no coverage will be available under this Policy for any such settlement, expense, payment, liability, or obligation in excess of the Retention.

(Atlantic Policy, § IV How Claims Will Be Handled (C), as amended by Endorsement No. 8.)

98.     The Atlantic Policy includes the following provision:

**We** will have the right to make investigations and conduct negotiations, and, with **your** consent, to enter into a settlement of any **Claim** which is reasonably likely to exceed the Retention, as **we** deem appropriate. If **you** refuse to consent to a settlement in excess of the Retention that is acceptable to the claimant in accordance with **our** recommendation, then, subject to **our** applicable Limits of Liability stated in the Declarations, **our** liability for such **Claim** will not exceed:

(1)     the amount for which the **Claim** could have been settled plus **Claim Expenses** up to the date **you** refused to settle such **Claim** (the "Settlement Amount"); plus

(2)     seventy percent (70%) of any **Damages** or **Claim Expenses** in excess of the Settlement Amount incurred in connection with the **Claim**. The remaining thirty percent (30%) of **Damages** and **Claim Expenses** in excess of the Settlement Amount will be carried by **you** at **your** own risk and will be uninsured.

(Atlantic Policy, § IV How Claims Will Be Handled (D), as amended by Endorsement No. 8.)

99.     The Atlantic Policy includes the following Reporting Obligation (A):

(2)     If, during the **Policy Period** or made any applicable Extended Reporting Period, any **Claim** is first against **you** and:
(a)     **you** reasonably believe the **Claim** may result in **Claim Expenses** and/or **Damages** in an amount exceeding fifty percent (50%) of the applicable Retention amount stated in the Declarations;

(b)     such **Claim** constitutes a **Class Action Claim**; or

(c)     such **Claim** is based upon or arises out of, **Antitrust Activity**,

then **you** must, as a condition precedent to any right to coverage under this Policy, give **us** written notice of such **Claim**, separate and apart from any bordereau report required under subparagraph (1) above, as soon as practicable thereafter and in no event later than:

(i)     with respect to any **Claim** first made during the **Policy Period**, ninety (90) days after the Expiration Date of this Policy stated in the Declarations or any earlier cancellation or termination of this Policy; or

(ii)     with respect to any **Claim** first made during any applicable Extended Reporting Period, the expiration of such applicable Extended Reporting Period.

**Your** timely and sufficient notice of a **Claim** will be deemed timely and sufficient notice for all of **you** involved in the **Claim**. The notice must give full particulars of the **Claim,** including but not limited to: information about the act, error, or omission; the identity of all potential claimants and any of **you** involved; a description of the damages that resulted from the act, error, or omission; and the manner in which **you** first became aware of the act, error, or omission.

\* \* \*

(5)     For the purposes of subparagraph (A)(2) and (3), the term "**Class Action Claim**" means any Claim brought or filed originally as, or amended at any time seeking certification as, a class action, whether or not such action is actually certified.

(Atlantic Policy, § VII Your Reporting Obligations (A)(2) and (5), as amended by Endorsement No. 8.)

100.    The Atlantic Policy includes the following General Condition (A):

**Assistance and Cooperation**

**You** are obligated to provide **us** with all information, assistance, and cooperation that **we** reasonably request, including but not limited to

information, assistance, and cooperation in the investigation, association, defense, settlement, or other resolution of a **Claim**; the pursuit or enforcement of any right of subrogation, contribution, indemnity, or other obligation from another; or conduct with respect to any action, suit, appeal, or other proceeding.

(Atlantic Policy, § VIII General Condition (A).)

101.    The Atlantic Policy includes the following General Condition (B):

**Subrogation**

In the event of any payment under this Policy, **we** will be subrogated to the extent of the payment to all of **your** rights of recovery from any person or entity other than one of **you**. **You** must do everything necessary to secure these rights, including but not limited to executing any documents necessary to allow **us** to effectively bring suit in **your** name. **You** also must do nothing that may prejudice **our** position or **our** potential or actual rights of recovery.

(Atlantic Policy, § VIII General Condition (B).)

102.    The Atlantic Policy includes the following General Condition (C):

**Other Insurance**

The coverage provided under this Policy shall be specifically excess of, and will not contribute with: (1) any other valid and collectible insurance or self-insurance, unless such other insurance or self-insurance is specifically written as excess of this Policy; and (2) any defense, hold harmless, or indemnification that **you** are entitled to from any person or entity other than one of **you**.

(Atlantic Policy, § VIII General Condition (C), as amended by Endorsement No. 7.)

### The Federal Policy

103.    Federal issued a primary Executive Liability, Entity Liability, and Employment Practices (including Directors and Officers or "D&O") Liability Insurance Policy, Policy No. 8209-4913 to BCBS-NC for the policy period January 1, 2012 through January 1, 2013, that provides certain coverage to BCBS-NC in excess of this Court's

jurisdictional threshold pursuant to the policy's terms, conditions, and exclusions. Excerpts of the Federal Policy can be found in the letters attached as **Exhibits 2-3**.

104.     The Federal Policy provides coverage, as relevant here, under Clause 3 which "provides that Federal shall pay, on behalf of the Organization, Loss which the Organization becomes legally obligated to pay on account of any Organization Claim first made against the Organization during the Policy Period or, if exercised, during the Extended Reporting Period, for a D&O Wrongful Act committed, attempted, or allegedly committed or attempted by the Organization or the Insured Persons before or during the Policy Period, but only if such Organization Claim is reported to the Company in writing in the manner and within the time provided in Subsection 18 of this coverage section." Federal's April 24, 2013 letter to BCBS-NC attached as **Exhibit 2** at pg. 2.

105.     The "Entity Coverage Section, as amended by Endorsement No. 19, provides an aggregate Limit of Liability of $15 million (inclusive of Defense Costs) for each Organization Claim and for all Organization and D&O Claims, combined, first made during the Policy Period, subject to (i) a $25 million Maximum Aggregate Limit of Liability for all D&O, Organization, Employment and Third Party Claims first made during the Policy Period, combined, and (ii) a $1.5 million Retention for each Claim based upon, arising from, or in consequence of any Antirust Violation. Federal shall not be liable for any amount within the applicable Retention or in excess of the applicable Limit of Liability." *Id.* at pg. 3.

106.    The Federal Policy contains an E&O Exclusion.  "Subsection (3) the Entity Coverage Section's Limited E&O Exclusion, as set forth in Endorsement No. 28, provides that no coverage is available under the Entity Coverage Section for Loss on account of any Claim made against any Managed Care Organization for any Managed Care Activity."  *Id.* at pg. 4.

107.    The Federal Policy defines "Managed Care Organization . . . as any entity, including but not limited to any health maintenance organization (HMO), preferred provider organization (PPO), physician hospital organization (PHO), or independent practice association (IPA) that is organized to perform any Managed Care Activity or to arrange for the delivery of health care services through various mechanisms intended to manage the cost and quality of health care services."  *Id.* at pg. 4.

108.    "Managed Care Activity" is defined as "any of the following services or activities: Utilization Review, Claim Services, reviewing the quality of Medical Services or providing quality assurance; wellness or health promotion education: development or implementation of clinical guidelines, practice parameters or protocols; triage for payment of Medical Services; and services or activities performed in the administration or management of health care or workers' compensation plans."  *Id.* at pg. 4.

109.    Federal contends that plaintiffs in the MDL Action allege that the Company committed various wrongdoing with respect to health insurance plans and managed care activities.  To the extent all of the claims in the MDL Action allege wrongdoing

described in the E&O Exclusion, Federal contends no coverage would available for the MDL Action under the Federal Policy. *Id.* at pg. 4.

110. Pursuant to Subsection 16(j) of the Entity Coverage Section of the Federal Policy, "all Related Claims shall be treated as a single Claim first made on the date the earliest of such Related Claims was first made, or on the date the earliest of such Related Claims is treated as having been made in accordance with Subsection l8(b) of this coverage section, regardless of whether such date is before or during the Policy Period. No coverage shall be available for such Related Claims except under the policy in effect at the time when the first such Claim was deemed made." *Id.* at pg. 4.

111. "Related Claims" are defined to mean "all Claims for Wrongful Acts based upon, arising from, or in consequence of the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events." *Id.* at pg. 4.

112. Federal treated the Subscriber Track and Provider Track as Related Claims under its Policy, and therefore as a single Claim subject to one retention, subject to Federal reserving its right to assert the MDL Action related back to the *Love* Litigation and therefore "as a Claim first made prior [sic] inception of [the Federal] Policy, pursuant to Subsection 16(j) of the Policy's Entity Coverage Section." *Id.* at pg. 4-5. Upon information and belief, BCBS-NC did not reject or otherwise challenge this contention.

## The BCS E&O Policy

113.    BCS issued an excess E&O Insurance Policy, Policy No. XS MCE 121-310 for the policy period January 1, 2012 through January 1, 2013 that provides certain coverage to BCBS-NC in excess of this Court's jurisdictional threshold pursuant to the policy's terms, conditions, and exclusions.  The BCS E&O Policy follows form to the Atlantic Policy.  A copy of the BCS E&O Policy is attached as **Exhibit 4**.

### The BCS D&O Policy

114.    BCS issued an excess D&O Insurance Policy, Policy No. XSD/O 121-310 for the policy period January 1, 2012 through January 1, 2013 that provides certain coverage to BCBS-NC in excess of this Court's jurisdictional threshold pursuant to the policy's terms, conditions, and exclusions.  The BCS D&O Policy follows form to the Federal Policy.  A copy of the BCS D&O Policy is attached as **Exhibit 5.**

### FORMATION AND REPUDIATION OF THE DEFENSE AGREEMENT

115.    Federal and Atlantic finalized the Defense Agreement in order to allocate potentially covered Loss between their respective Policies.  With respect to Loss resulting from the claims in the MDL Action for which both Federal and Atlantic recognized a potential for coverage (subject to a reservation of rights), Federal agreed to pay all Loss potentially covered under the Federal Policy (excess of Federal's $1.5 million per Claim Retention) until all such Loss exceeded $5 million.  Thereafter, Federal agreed to pay 60% and Atlantic agreed to pay 40% of all Loss excess of $5 million which was potentially covered under each of the Federal Policy and the Atlantic Policy.

116.   The Atlantic Policy requires its $5 million retention to be paid by BCBS-NC.   Pursuant to the Defense Agreement, Atlantic agreed to allow Federal's payments of reasonable defense expenses under its Policy to satisfy the $5 million retention under the Atlantic Policy.   Atlantic did so in exchange for consideration obtained in the Defense Agreement and as an accommodation to BCBS-NC.   Specifically, Federal's consideration was its agreement to advance defense costs with Atlantic at a ratio of 60% by Federal and 40% by Atlantic.  *See id.*

117.   Both the Federal Policy and the Atlantic Policy require their retentions to be satisfied by payments for loss covered under each Policy, respectively.   As it is BCBS-NC's position that the Federal D&O and Atlantic E&O Policies cover independent aspects of the MDL Action, then payments made by Federal under its Policy, or by BCBS-NC to satisfy the retention under the Federal Policy, cannot be applied to satisfy the retention under Atlantic's Policy.   The Atlantic Policy further mandates that BCBS-NC satisfy the $5 million retention by payments out of its own pocket.   Therefore, absent the Defense Agreement, the Atlantic Policy is not triggered unless and until BCBS-NC makes $5 million in payments for covered loss under the Atlantic Policy, separate and apart from paying $1.5 million to exhaust the Federal retention.

118.   Once BCBS-NC and Federal paid in excess of $5 million in reasonable defense expenses, Atlantic began to reimburse under its Policy as promised.   To date, Atlantic has reimbursed Federal $600,000 pursuant to the Defense Agreement and has reimbursed BCBS-NC at least $1,754,311 for defense of the MDL Action.

119.    In October of 2018, however, Federal unilaterally repudiated the Defense Agreement and decided to reduce its contribution to BCBS-NC's defense costs both prospectively and retroactively to account for loss allegedly not covered under its Policy. Federal also refused to advance additional defense costs until BCBS-NC incurs defense expenses allocable to the Federal Policy in excess of Federal's alleged "overpayment" of $5,879,126.  A copy of Federal's letter repudiating the Defense Agreement is attached as **Exhibit 3**.

120.    Federal's unilateral repudiation of the agreement relieves Atlantic of its agreement to permit Federal's payments to erode BCBS-NC's retention under the Atlantic Policy.

121.    BCBS-NC contends Federal's payments for BCBS-NC's defense expenses, along with BCBS-NC's $1.5 million payments in satisfaction of Federal's retention, both erode the $5 million retention under the Atlantic Policy.  Accordingly, BCBS-NC has now turned to Atlantic for payment of 100% of defense costs incurred by BCBS-NC in defending the MDL Action.

122.    To Atlantic's knowledge, BCBS-NC has done nothing to formally challenge Federal's decision to discount its prior and/or future contributions to defense expenses.

## <u>NATURE OF THE CONTROVERSY</u>

123.    BCBS-NC provided notice of the antitrust class action complaints and subsequently the Provider and Subscriber Track complaints to its insurers requesting coverage under their policies.

124.    There is an actual controversy of a judicial nature between Atlantic and BCBS-NC involving the parties' rights and liabilities under the Atlantic Policy which provides E&O liability insurance to BCBS-NC pursuant to its terms, conditions and exclusions.

125.    Despite Atlantic's requests, BCBS-NC refuses to provide reasonably requested information necessary for Atlantic to (1) assess BCBS-NC's potential liability in the class action lawsuits consolidated in the MDL Action and to (2) make determinations regarding coverage.  There is thus a bona fide present dispute between Atlantic and BCBS-NC regarding the scope of the obligations of the parties under the Assistance and Cooperation clause.

126.    There is also an actual controversy of a judicial nature between Atlantic and Federal involving the parties' rights and obligations under their respective Policies.

127.    There are thus bona fide present disputes between Atlantic and BCBS-NC regarding:

>    a.    Whether the claims BCBS-NC submitted with respect to the Provider Track and the Subscriber Track are Related Claims under the Atlantic Policy, or, in the alternative, if the Claims are not Related, whether BCBS-NC must

satisfy two retentions, or pay $10 million of covered loss, before the Atlantic Policy is triggered;

b. Whether the *Love* Litigation is a Related Claim under the Atlantic Policy, barring coverage for the claims related to the MDL Action as claims made prior to the Inception Date;

c. Whether the Prior and Pending Exclusion bars coverage for the MDL Action;

d. Whether BCBS-NC (or another insured) must itself pay $5 million to exhaust the Atlantic Policy retention;

e. Whether payments made for covered or potentially covered loss under the Federal Policy exhaust the Atlantic Policy retention;

f. The scope of the obligations of the parties under the Assistance and Cooperation clause;

g. Whether BCBS-NC breached the Assistance and Cooperation clause;

h. Whether BCBS-NC's breach of the Assistance and Cooperation clause bars coverage;

i. Whether Atlantic is entitled to specific performance under the Assistance and Cooperation clause in the form of specific information and documents; and

j. Whether Atlantic is entitled to reimbursement of all defense expenses it has paid to BCBS-NC with respect to the MDL Action for loss not covered

under the Atlantic Policy pursuant to the Related Claims provision and/or the Prior and Pending Litigation Exclusion, and/or as a result of BCBS-NC's breach of the Assistance and Cooperation condition.

128. There are also bona fide present disputes between Atlantic and Federal regarding:

    a. Whether Federal breached the Defense Agreement relieving Atlantic of its agreement to permit Federal's payments to erode BCBS-NC's retention under the Atlantic Policy;

    b. Whether Atlantic is entitled to reimbursement of that portion of defense expenses and any settlement or judgment paid by Atlantic for which Federal is liable as a matter of equity, plus interest thereon; and

    c. Whether Atlantic has the right to reimbursement, pursuant to the Subrogation provision of the Atlantic Policy, for all sums Atlantic has been forced to prematurely pay to Federal and/or BCBS-NC relating to the MDL Action.

129. BCS is joined pursuant to Federal Rule of Civil Procedure 19(a)(1)(B)(i) and (ii) as its E&O and D&O Policies follow form to the Atlantic and Federal Policies, respectively. BCS therefore has a material interest in the subject matter of the case and is needed for just adjudication. Its involvement will assure that any judgment rendered will provide complete relief to the existing parties and prevent repeated lawsuits on the same subject matter.

## FIRST COUNT

### (Declaratory Relief Against BCBS-NC: Related Claims)

130.     Atlantic hereby incorporates by reference and re-alleges as if fully stated herein, each and every allegation of Paragraphs 1 through 129 of this Complaint.

131.     An actual controversy exists between Atlantic, on the one hand, and BCBS-NC, on the other, with respect to whether the claims BCBS-NC submitted to Atlantic with respect to the Provider Track and the Subscriber Track are Related Claims under the Atlantic Policy:

> **Related Claims** means all **Claims** based upon or arising out of the same or related acts, errors, omissions, or course of conduct or the same or related series of acts, errors, omissions, or course of conduct.

(Atlantic Policy, § III Definition (R).)

132.     Atlantic is entitled to a declaratory judgment in its favor, stating that the claims BCBS-NC submitted with respect to the Provider Track and the Subscriber Track are Related Claims under the Atlantic Policy.  In the alternative, if the Claims are not Related, Atlantic seeks a judicial declaration that BCBS-NC must satisfy two retentions, or pay $10 million of covered loss, before the Atlantic Policy is triggered.

## SECOND COUNT

### (Declaratory Relief Against BCBS-NC: Related Claims)

133.     Atlantic hereby incorporates by reference and re-alleges as if fully stated herein, each and every allegation of Paragraphs 1 through 132 of this Complaint.

134.     An actual controversy exists between Atlantic, on the one hand, and BCBS-NC, on the other, with respect to whether the *Love* Litigation is a Related Claim under the Atlantic Policy:

> **Related Claims** means all **Claims** based upon or arising out of the same or related acts, errors, omissions, or course of conduct or the same or related series of acts, errors, omissions, or course of conduct.

(Atlantic Policy, § III Definition (R).)

135.     Atlantic is entitled to a declaratory judgment in its favor, stating that the *Love* Litigation is a Related Claim with respect to the MDL Action claims made under the Atlantic Policy, barring coverage as a claim first made prior to the Inception Date.

## THIRD COUNT

### (Declaratory Relief Against BCBS-NC: Prior and Pending Exclusion)

136.     Atlantic hereby incorporates by reference and re-alleges as if fully stated herein, each and every allegation of Paragraphs 1 through 135 of this Complaint.

137.     An actual controversy exists between Atlantic, on the one hand, and BCBS-NC, on the other, with respect to whether the Prior and Pending Exclusion bars coverage:

> No coverage will be available under this Policy for any **Claim**, **Damages**,
>
> or **Claim Expenses**:
>
> **(D)**     based upon or arising out of any:
>
> * * *
>
> (3)     prior or pending litigation or administrative, regulatory or other proceeding against any of **you** as of the Inception Date of this Policy, or the same or substantially the same act, error, or omission underlying or alleged therein;

provided that if this Policy is a renewal of one or more policies previously issued by **us** to the **Named Insured,** and the coverage provided by **us** to the **Named Insured** was in effect, without interruption, for the entire time between the inception date of the first such other policy and the Inception Date of this Policy, the reference in this Exclusion to the Inception Date will be deemed to refer instead to the inception date of the first policy under which **we** began to provide the **Named Insured** with the continuous and uninterrupted coverage of which this Policy is a renewal;

(Atlantic Policy, § II What This Policy Excludes (D).)

138.     Atlantic is entitled to a declaratory judgment in its favor, stating that the Prior and Pending Exclusion bars coverage for the MDL Action claims.

## <u>FOURTH COUNT</u>

**(Declaratory Relief Against BCBS-NC: Exhaustion of Retention by BCBS-NC)**

139.     Atlantic hereby incorporates by reference and re-alleges as if fully stated herein, each and every allegation of Paragraphs 1 through 138 of this Complaint.

140.     An actual controversy exists between Atlantic, on the one hand, and BCBS-NC, on the other, with respect to whether BCBS-NC must pay to exhaust the retention under the Atlantic Policy:

**Retention. You** will be responsible for payment in full of the amount stated as the Retention in the Declarations, which will apply to **Damages** and **Claim Expenses** from each **Claim** for which this Policy provides coverage. **Our** obligation to make any payment under this Policy for any **Claim** will be excess of the Retention. If **you** are unable or unwilling to pay the full amount of the Retention, the **Named Insured** will be responsible for payment in full of the Retention on **your** behalf. **We** have no obligation whatsoever to pay any portion of the Retention; however, **we** may choose to pay a portion of the Retention, in which case **you** will repay **us** any amounts paid by **us**, and the amounts paid will be credited against and will reduce the applicable Limits of Liability unless and until they are repaid in full by **you**. **Your** inability to pay, failure to pay, or refusal to pay any

portion of the Retention will not alter or increase **our** obligations under the Policy.

(Atlantic Policy, § V Limits of Liability and Retention (F).)

141.    Atlantic is entitled to a declaratory judgment in its favor, stating that the Atlantic Policy is not triggered unless and until BCBS-NC has paid $5 million to exhaust the Atlantic Policy retention.

## FIFTH COUNT

### (Declaratory Relief Against BCBS-NC: Exhaustion of Retention by Covered Loss)

142.    Atlantic hereby incorporates by reference and re-alleges as if fully stated herein, each and every allegation of Paragraphs 1 through 141 of this Complaint.

143.    An actual controversy exists between Atlantic, on the one hand, and BCBS-NC, on the other, with respect to whether payments made for covered or potentially covered loss under the Federal Policy may exhaust BCBS-NC's retention under the Atlantic Policy:

> **Retention. You** will be responsible for payment in full of the amount stated as the Retention in the Declarations, which will apply to **Damages** and **Claim Expenses** from each **Claim** for which this Policy provides coverage. **Our** obligation to make any payment under this Policy for any **Claim** will be excess of the Retention. If **you** are unable or unwilling to pay the full amount of the Retention, the **Named Insured** will be responsible for payment in full of the Retention on **your** behalf. **We** have no obligation whatsoever to pay any portion of the Retention; however, **we** may choose to pay a portion of the Retention, in which case **you** will repay **us** any amounts paid by **us**, and the amounts paid will be credited against and will reduce the applicable Limits of Liability unless and until they are repaid in full by **you**. **Your** inability to pay, failure to pay, or refusal to pay any portion of the Retention will not alter or increase **our** obligations under the Policy.

(Atlantic Policy, § V Limits of Liability and Retention (F).)

144.    Atlantic is entitled to a declaratory judgment in its favor, stating that payments made for covered or potentially covered loss under the Federal Policy by definition do not exhaust the Atlantic Policy retention.

## SIXTH COUNT

**(Declaratory Relief Against BCBS-NC: Duties Under Assistance and Cooperation Provision of Atlantic Policy)**

145.    Atlantic hereby incorporates by reference and re-alleges as if fully stated herein, each and every allegation of Paragraphs 1 through 144 of this Complaint.

146.    An actual controversy exists between Atlantic, on the one hand, and BCBS-NC, on the other, with respect to the parties' duties and obligations under the Atlantic Policy.   Pursuant to the Atlantic Policy's General Conditions, BCBS-NC must comply with the following Assistance and Cooperation clause in the Atlantic Policy:

> **Assistance and Cooperation**
> **You** are obligated to provide **us** with all information, assistance, and cooperation that **we** reasonably request, including but not limited to information, assistance, and cooperation in the investigation, association, defense, settlement, or other resolution of a **Claim**; the pursuit or enforcement of any right of subrogation, contribution, indemnity, or other obligation from another; or conduct with respect to any action, suit, appeal, or other proceeding.

(Atlantic Policy, § VIII General Condition (A).)

147.    Atlantic contends that the Assistance and Cooperation clause requires BCBS-NC to provide information and documents reasonably requested including, but not limited to:

a. All written analyses or reports relating to BCBS-NC's potential exposure (including assessment of settlement value of the Subscriber and Provider Track claims);

b. All analyses of the liability allocation percentage for BCBS-NC;

c. A list of all persons deposed in the MDL Action and their employer/affiliation;

d. Summaries of all depositions taken in the MDL Action;

e. Any analyses of the impact of depositions taken in the MDL Action;

f. Any analyses regarding expert witnesses (including expert disclosures, reports and depositions) involved in the MDL Action;

g. Any analyses of the impact of recent rulings in the MDL Action including, but not limited to, the standard of review issue in the MDL Action;

h. Any discovery requests and responses thereto from the MDL Action that have not been provided;

i. All privilege logs served in the MDL Action, including but not limited to the privilege log as certified in November of 2017;

j. All documents produced by BCBS-NC in the MDL Action;

k. Any key documents (meaning those identified by BCBS-NC or other counsel for the Blues as having an impact on the merits of the MDL Action) produced, obtained or received in discovery;

l. All analyses of settlement offers or demands in the MDL Action;

m. Any communications regarding allocation of liability between BCBS-NC and other defendants in the MDL Action, including regarding any formula that has been proposed to BCBS-NC to determine its allocation of any settlement or judgment;

n. Any communications regarding the expected contribution or percentage allocation of any settlement to the Association in the MDL Action;

o. Any internal communications regarding allocation of any aggregate settlement among potentially covered and uncovered causes of action in the MDL Action (excluding any communications between BCBS-NC and its coverage counsel, McCarter & English, LLP);

p. Any communications regarding any allocation of any aggregate settlement among the requested relief and damages in the MDL Action;

q. All Term Sheets exchanged in the MDL Action and related to potential settlement of the MDL Action;

r. All written agreements, including licensing agreements, between BCBS-NC and the Association;

s. All communications received by BCBS-NC relating to the class action complaints and the MDL Action prior to retention of defense counsel;

t. All information, analysis, reports, power point presentations or other documents regarding potential claims in the MDL Action concerning Administrative Services Only plans ("ASOs") (including the value of such claims, damage estimates and the value of any release of ASO claims in any settlement); and

u. Any communications with an ASO relating to the MDL Action.

148. To date, and despite requests by Atlantic, BCBS-NC has not provided the majority of the information or documents described in the preceding Paragraph. Therefore, an actual controversy presently exists between Atlantic and BCBS-NC regarding the parties' rights and obligations and BCBS-NC's compliance with the Assistance and Cooperation Clause in the Atlantic Policy.

149. Atlantic is entitled to a declaratory judgment in its favor, stating BCBS-NC must comply with the Assistance and Cooperation clause in order to be entitled to any coverage under the Atlantic Policy. Moreover, Atlantic requests a declaratory judgment concerning the scope of the rights and obligations of the parties under the Assistance and Cooperation clause.

## SEVENTH COUNT

### (Breach of Contract Against BCBS-NC: Assistance and Cooperation Provision of Atlantic Policy)

150. Atlantic hereby incorporates by reference and re-alleges as if fully stated herein, each and every allegation of Paragraphs 1 through 149 of this Complaint.

151. The Atlantic Policy is a valid and enforceable contract.

152. Atlantic has performed all conditions, covenants and promises required on its part to be performed under the Atlantic Policy.

153. BCBS-NC refuses to provide reasonably requested and relevant information and documents necessary for Atlantic's coverage investigation in breach of the Assistance and Cooperation clause in the Atlantic Policy.

154. As a result of BCBS-NC's breach of the contract, Atlantic has been damaged in an amount to be determined at trial.

## EIGHTH COUNT

### (Declaratory Relief Against BCBS-NC: No Coverage Due to Breach of Assistance and Cooperation Provision of Atlantic Policy)

155. Atlantic hereby incorporates by reference and re-alleges as if fully stated herein, each and every allegation of Paragraphs 1 through 154 of this Complaint.

156. An actual controversy exists between Atlantic, on the one hand, and BCBS-NC, on the other, with respect to whether BCBS-NC breached the Atlantic Policy's Assistance and Cooperation provision, and whether this breach bars coverage.

157. The Assistance and Cooperation provision obligates the insured to disclose all of the facts within its knowledge and otherwise to aid the insurer in its determination of coverage under the policy.

158. BCBS-NC refuses to provide reasonably requested and relevant information and documents necessary for Atlantic's coverage investigation in breach of the Assistance and Cooperation clause in the Atlantic Policy.

159. BCBS-NC's breach of the Assistance and Cooperation provision has substantially prejudiced Atlantic in connection with the underlying class action antitrust complaints and the MDL Action for which BCBS-NC seeks coverage.

160. Atlantic is entitled to a declaratory judgment in its favor, stating that BCBS-NC's breach of the Assistance and Cooperation clause bars coverage.

## <u>NINTH COUNT</u>

### (Breach of Contract Against BCBS-NC: Specific Performance)

161. Atlantic hereby incorporates by reference and re-alleges as if fully stated herein, each and every allegation of Paragraphs 1 through 160 of this Complaint.

162. The Atlantic Policy is a valid and enforceable contract.

163.    Atlantic has performed all conditions, covenants and promises required on its part to be performed under the Atlantic Policy.

164.    BCBS-NC continues to refuse to produce reasonably requested and relevant documents necessary for Atlantic's coverage investigation in breach of the Assistance and Cooperation clause in the Atlantic Policy.

165.    Atlantic has no adequate remedy at law to obtain these documents. Monetary damages are inadequate.

166.    Atlantic will suffer irreparable injury absent BCBS-NC's cooperation as required by the Atlantic Policy.

167.    Atlantic should therefore be granted specific performance pursuant to the Assistance and Cooperation clause in the Atlantic Policy and be provided with the information and documents necessary for a coverage determination.

## TENTH COUNT

### (Declaratory Relief Against BCBS-NC: Reimbursement)

168.    Atlantic hereby incorporates by reference and re-alleges as if fully stated herein, each and every allegation of Paragraphs 1 through 167 of this Complaint.

169.    An actual controversy exists between Atlantic, on the one hand, and BCBS-NC, on the other, with respect to whether Atlantic is entitled to reimbursement of all defense expenses it has paid to BCBS-NC with respect to the MDL Action for loss not covered under the Atlantic Policy.

170.    Atlantic is entitled to a declaratory judgment in its favor, stating that it is entitled to reimbursement of all defense expenses advanced to BCBS-NC.

## ELEVENTH COUNT

**(Declaratory Relief Against Federal: Breach of the Defense Agreement)**

171.    Atlantic hereby incorporates by reference and re-alleges as if fully stated herein, each and every allegation of Paragraphs 1 through 170 of this Complaint.

172.    The Defense Agreement is a valid and enforceable contract.

173.    Atlantic has performed all conditions, covenants and promises required on its part to be performed under the Defense Agreement.

174.    Federal unilaterally repudiated the Defense Agreement.

175.    As a result of Federal's breach of the Defense Agreement, Atlantic is entitled to a declaratory judgment in its favor, stating that Federal's unilateral repudiation of the Defense Agreement relieves Atlantic of its agreement to permit Federal's payments to erode BCBS-NC's retention under the Atlantic Policy.

## TWELFTH COUNT

**(Declaratory Relief Against Federal: Equitable Contribution)**

176.    Atlantic hereby incorporates by reference and re-alleges as if fully stated herein, each and every allegation of Paragraphs 1 through 175 of this Complaint.

177.    Atlantic provided primary E&O liability insurance to BCBS-NC, with limits of $10 million in excess of a $5 million retention, according to its terms, conditions and exclusions.

178. Federal provided primary D&O liability insurance to BCBS-NC with limits of $15 million in excess of a $1.5 million retention per antitrust D&O claim, according to its terms, conditions and exclusions.

179. Federal originally agreed to reimburse 100% of reasonable defense expenses incurred by BCBS-NC in defense of the MDL Action in excess of the $1.5 million retention required by the Federal Policy, subject to a reservation of rights. Federal has since decided to reduce its contribution to BCBS-NC's defense costs both prospectively and retroactively and is not currently contributing to BCBS-NC's defense of the MDL Action.

180. Under the Atlantic Policy, Atlantic assumes a duty to defend only upon proper exhaustion of its $5 million retention.

181. BCBS-NC has demanded coverage for the MDL Action from Atlantic under the Atlantic Policy, despite having not satisfied the Policy's $5 million retention.

182. Atlantic, in order to protect its interests and the interests of Federal's and Atlantic's mutual insured, is advancing defense expenses to BCBS-NC for the MDL Action.

183. Atlantic has and continues to pay more toward BCBS-NC's defense of the MDL Action than equity demands. Federal has an obligation to reimburse Atlantic for the amount that it should be paying toward BCBS-NC's defense and any potentially forthcoming settlement or judgment.

184.    Atlantic is entitled to a declaratory judgment in its favor, awarding to Atlantic that portion of defense expenses and any settlement or judgment paid by Atlantic for which Federal is liable as a matter of equity, plus interest thereon.

## THIRTEENTH COUNT

**(Declaratory Relief Against Federal and BCBS-NC: Extent of Atlantic's Subrogation Rights)**

185.    Atlantic hereby incorporates by reference and re-alleges as if fully stated herein, each and every allegation of Paragraphs 1 through 184 of this Complaint.

186.    BCBS-NC has demanded coverage for the MDL Action from Atlantic under the Atlantic Policy.

187.    Atlantic has been forced to decide between: (1) advancing BCBS-NC's defense expenses under the Atlantic Policy, despite the Atlantic Policy's retention having not having been exhausted, and at the risk that Atlantic may be prejudiced in or precluded from seeking reimbursement of any sums it prematurely reimburses; or (2) refusing to provide BCBS-NC with reimbursement or indemnity until BCBS-NC incurs $5 million in loss covered under the Atlantic Policy, which could potentially expose Atlantic to bad faith allegations.

188.    To protect its insured's interests, Atlantic has agreed, as BCBS-NC's insurer, and not as a volunteer, to reimburse 100% of BCBS-NC's reasonable defense expenses despite BCBS-NC's failure to satisfy the self-insured retention under the Atlantic Policy.

189.   Thus, an actual controversy exists regarding what rights Atlantic has to seek subrogation against another person or entity under the Atlantic Policy:

**Subrogation**

In the event of any payment under this Policy, **we** will be subrogated to the extent of the payment to all of **your** rights of recovery from any person or entity other than one of **you**. **You** must do everything necessary to secure these rights, including but not limited to executing any documents necessary to allow **us** to effectively bring suit in **your** name. **You** also must do nothing that may prejudice **our** position or **our** potential or actual rights of recovery.

(Atlantic Policy, § VIII General Condition (B).)

190.   Atlantic is entitled to a declaratory judgment in its favor stating that Atlantic has the right, pursuant to the Subrogation provision of the Atlantic Policy, for all sums Atlantic has been forced to prematurely pay to Federal and/or BCBS-NC relating to the MDL Action.

## FOURTEENTH COUNT

### (Declaratory Relief Against BCS: Follow Form)

191.   Atlantic hereby incorporates by reference and re-alleges as if fully stated herein, each and every allegation of Paragraphs 1 through 190 of this Complaint.

192.   BCS issued an excess E&O Insurance Policy, Policy No. XS MCE 121-310 for the policy period January 1, 2012 through January 1, 2013 that provides certain coverage to BCBS-NC pursuant to the policy's terms, conditions, and exclusions.

193.   The BCS E&O Policy generally follows form to the Atlantic Policy.

194.   BCS therefore has a material interest in the subject matter of the case and is needed for just adjudication.

195. In order to assure that any judgment rendered in this case will provide complete relief to the existing parties and prevent repeated lawsuits on the same subject matter, Atlantic seeks a declaratory judgment that BCS is bound by this Court's determinations concerning the Atlantic Policy for any provision(s) to which the BCS E&O Policy follows form.

**WHEREFORE**, Atlantic prays for relief as follows:

1. For a declaration of the rights, duties, and obligations of the parties herein as follows:

   a. That the claims BCBS-NC submitted with respect to the Provider Track and the Subscriber Track are Related Claims under the Atlantic Policy, or, in the alternative, if the Claims are not Related, that BCBS-NC must satisfy two retentions, or pay $10 million of covered loss, before the Atlantic Policy is triggered;

   b. That the *Love* Litigation is a Related Claim under the Atlantic Policy barring coverage as a claim made prior to the inception date;

   c. That the Prior and Pending Exclusion bars coverage;

   d. That BCBS-NC (or another insured) must itself pay $5 million to exhaust the Atlantic Policy retention if there is in fact any coverage for the MDL Action;

e.  That payments made for covered or potentially covered loss under the Federal Policy do not exhaust the Atlantic Policy retention, assuming coverage;

f.  That Atlantic is entitled to BCBS-NC's cooperation under the Atlantic Policy including, but not limited to, the specific documents and information requested in Paragraph 149 including any memorandum of understanding or settlement agreement purporting to settle the issues raised in the Related Claim;

g.  That BCBS-NC breached the Assistance and Cooperation clause;

h.  That there is no coverage due to BCBS-NC's breach of the Assistance and Cooperation clause;

i.  For specific performance by way of production of information and documents required by the Assistance and Cooperation clause; and

j.  That Atlantic is entitled to reimbursement of all defense expenses it has paid to BCBS-NC with respect to the MDL Action for loss not covered under the Atlantic Policy pursuant to the Related Claims provision and/or the Prior and Pending Litigation Exclusion, and/or as a result of BCBS-NC's breach of the Assistance and Cooperation condition;

k.  That Federal breached the Defense Agreement relieving Atlantic of its agreement to permit Federal's payments to erode BCBS-NC's retention under the Atlantic Policy;

l.   That Atlantic is entitled to reimbursement of that portion of defense expenses and any settlement or judgment paid by Atlantic for which Federal is liable as a matter of equity, plus interest thereon;

m.   That Atlantic has the right to reimbursement, pursuant to the Subrogation provision of the Atlantic Policy, for all sums Atlantic has been forced to prematurely pay to Federal and/or BCBS-NC relating to the MDL Action; and

n.   That BCS is bound by this Court's determinations concerning the Atlantic Policy for any provision(s) to which the BCS E&O Policy follows form;

2.   For costs of suit; and

3.   For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Atlantic demands a trial by jury on all triable issues.

Respectfully submitted this 27th day of March, 2019.

/s/ Michael C. Gruman
MICHAEL C. GRUMAN
North Carolina State Bar No.: 33956
JENNIFER D. MALDONADO
North Carolina State Bar No.: 25708
**YATES, McLAMB & WEYHER, L.L.P.**
Post Office Box 2889
Raleigh, North Carolina 27602
Tel: 919-835-0900; Fax: 919-835-0910
EMAIL: mgruman@ymwlaw.com
EMAIL: jmaldonado@ymwlaw.com
*Attorneys for Plaintiff Atlantic Specialty*
*Insurance Company*
*L.R. 83.1(d)Counsel*

By:    /s/ *Justine M. Casey*

Justine M. Casey, *pending special appearance*
R. Randal Crispen, *pending special appearance*
Jenna A. Fasone, *pending special appearance*
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
650 Town Center Drive, Fourth Floor
Costa Mesa, CA 92626
Telephone: (714) 513-5100
Fax: (714) 513-5130
jcasey@sheppardmullin.com
rcrispen@sheppardmullin.com
jfasone@sheppardmullin.com
*Special Appearance Pending pursuant to L.R. 83.1(d)*